## 16881

PHILLIPS v. DAVIS *ET AL.*

(82 S. E. (2d) 515)

*Messrs. Williams & Parler,* of Lancaster, *for Appellant,*

*Messrs. D. Glenn Yarborough,* of Lancaster, and *Hemphill & Hemphill,* of Chester, *for Respondents,*

June 15, 1954.

LEGGE, Justice.

Appellant's intestate was instantly killed on the night of February 19, 1953, about 9:45 p. m., when he drove his Ford automobile into the rear of a bus of the respondent Davis, which had stopped, headed North, to take on a regular passenger on U. S. Highway No. 521 about one and one-half miles South of the Town of Lancaster.

This action was brought for his alleged wrongful death, and the appeal here is from the order of the trial judge directing a verdict for the defendants.

The complaint charged that the operator of the bus was negligent and violated the statutory law in stopping the bus in the main traveled portion of the East lane of the highway, when he could have moved it completely off the highway, and also was negligent in not having the bus equipped with the lights and safety devices required by law.

The defendants pleaded a general denial and contributory negligence on the part of plaintiff's intestate, specifying unlawful speed, failure to keep a proper lookout, and failure to heed the warning of the lights on the rear of the bus.

At the close of all of the testimony, the defendants moved for a directed verdict upon the ground that the plaintiff had failed to prove actionable negligence, and upon the further ground that, even if there were evidence of negligence, the only reasonable inference from all the testimony was that plaintiff's intestate was guilty of such contributory negligence as would bar recovery. The trial judge did not pass upon the first ground, but granted the motion upon the second.

On the night in question, the bus, owned by the defendant C. M. Davis, was on its regular run between Bethune and Lancaster, a distance of about thirty-four (34) miles. It left Bethune at 8:30 p. m., and was due to arrive in Lancaster about 9:45 p. m. Its operator was C. M. Davis' son, Manley Davis, who had had eleven years' experience as a bus driver and had been driving on this route for approximately a year. The regular passengers on this run were employees of a cotton mill in Lancaster, among them Mrs. Madelyn Carnes, who lived with her mother-in-law, Mrs. Mamie C. Carnes, in a house on the West side of U. S. Highway No. 521, about a mile and a half South of Lancaster. The deceased, Ernest E. Phillips, who lived at Kershaw, about seventeen miles South of Lancaster, was also an employee of the Lancaster mill, and had been a regular passenger on this run for some time and until a week or two before the accident. He was familiar with the schedule and with the various regular stops, including the stop regularly made to pick up Mrs. Carnes.

U. S. Highway No. 521, in front of the Carnes house, is of concrete, twenty (20) feet in width, with three (3) feet of asphalt "black top" shoulder on either side, making a total width of twenty-six (26) feet of pavement. The terrain is hilly, and this portion of the highway is near the top of a slight crest, sloping downward to the North. To the East of the asphalt shoulder is a rough dirt shoulder, and beyond that a ditch, except at a point, almost opposite the Carnes house, where a little field road joins the highway,

and immediately to the North of this junction, where there is a "little wide place." Grady Jones, a witness for the plaintiff, testified that at that particular point there was "room enough to get the bus off the highway".

The evening was clear and dry. About 9:45 p. m., the bus stopped, as usual, to pick up Mrs. Madelyn Carnes, who was standing on the dirt shoulder on the East side of the highway, just off the "black top" shoulder, and a few feet North of the junction of the little field road. The operator of the bus pulled over on the "black top" as far as possible, and brought the bus to a stop beside Mrs. Carnes, the right wheels being still on the "black top" shoulder. He opened the door, which was on the right side of the bus, abreast of the driver's seat, and Mrs. Carnes got aboard and was proceeding to her seat when the Phillips car crashed into the rear of the bus. The period of time between the stopping and the collision was a matter of seconds, or a minute at most.

On the back of the bus, in addition to two red reflectors, were two clearance lights, tail lights, and a large stop-light actuated by the brake. All of these lights were burning, and visible, to one in an automobile approaching from the South, for a distance of seven-tenths (7/10) of a mile. The bus was eight (8) feet wide, and at the time of the accident there were twenty-five or twenty-six passengers aboard.

The operator of the bus testified that as Mrs. Carnes was proceeding to her seat he saw, in the rear view mirror, a car coming up from behind very rapidly, that he blinked the clearance lights of the bus, and then, seeing that the car was going to strike the bus, he released the brakes. The force of the collision was such that, although the driver of the bus was holding onto the steering wheel, the back of the driver's seat was broken off. The entire front portion of the car was completely demolished.

Just before the collision a tractor-trailer truck was approaching from the North. There is some conflict as to

its exact position in relation to the bus at the time of the collision. One witness for the plaintiff, a passenger, testified that he did not see it until "just about the time of the collision," when it was "right beside the bus." Another passenger noticed its lights "coming from down the hill," but could not estimate its distance at the time of the collision. Another passenger did not see it at all. Mrs. Mamie Carnes, standing in the door of her house, saw it "coming up from down the road," but could give no estimate of its distance when the collision occurred. The bus operator testified that it was some One Hundred Fifty (150) or Two Hundred (200) yards North of the bus at the time of the collision.

The plaintiff's first witness, State Highway Patrolman Grady Jones, testified that he was at the police station in the Town of Lancaster when he learned of the accident, and that he drove immediately to the scene, arriving there about five minutes after the collision. He found the wreck of the Phillips car "sitting" on the concrete portion of the road, headed North, a few feet North of the point of impact. The front end of the car was "torn up." The bus was about Two Hundred (200) feet North of the car, headed north, with its right wheels on the asphalt shoulder on the east side of the road. The back of the bus was badly damaged, the point of impact appearing to have been at the left of its rear end. Witness observed on the pavement, just South of the point of collision, a skid mark Fifty (50) feet long, which he identified as having been made by one of the right-hand wheels of the Phillips car. He testified as before mentioned, that at the point of collision there was a "little wide place" on the dirt shoulder, wide enough to have permitted the bus to get off the highway at that particular point. On direct examination, he testified that there was a ditch on that side of the road to the South of the field road junction, and "right down beyond where this little wide place ends". On cross-examination, he testified that the bus was equipped, on the rear, with two red reflectors, a tail light, clearance lights, and a big stop-light; and that when he arrived at

the scene of the accident the clearance lights were burning, the tail light wire had been freshly knocked loose, and the stop-light was "torn all to pieces." He also testified to the width of the pavement and "black top" shoulders, and to the fact that on the day following the accident he had measured the distance at which the bus, at the point of the collision, could be seen by a person in an automobile approaching from the South, and had found that distance to be seven-tenths (7/10) of a mile.

Plaintiff's next witness, William Deese, had boarded the bus at Heath Springs, where he lived, to go to his work at Lancaster Cotton Mill. He did not see the Phillips car, or its lights, until the collision occurred. He testified on cross examination that he had been riding this bus for about a year; that he knew plaintiff's intestate, Ernest E. Phillips, who, until a week or two before the accident, had been riding this bus and was familiar with its schedule and its stops. He testified further that when the bus stopped to pick up Mrs. Carnes, who was a regular passenger, she was standing on the dirt shoulder, and that the bus went as far off to the right on the pavement as was possible without striking her.

R. M. Neal, also a witness for the plaintiff, testified that at 9:15 p. m. on the night of the accident he had seen Ernest E. Phillips at the latter's home near Kershaw, about seventeen (17) miles from the scene of the accident, and that the witness had seen the Davis bus at or near Kershaw some five or ten minutes earlier.

Charles Zimmerman, another witness for the plaintiff, testified that just prior to the time of the accident he had been driving at about Thirty-five (35) or Forty (40) miles per hour, in a Northerly direction on Highway No. 521, and that the Phillips car had overtaken and passed him about one and one-half (1½) miles South of the point of collision. He did not testify to the speed of the Phillips car.

The only other witnesses offered by the plaintiff were Lonnie S. Phillips, the father of the deceased, whose testi-

mony does not bear on the facts of the accident, and Thomas F. Phillips, the plaintiff, a brother of the deceased, who testified that he went to the scene of the accident shortly after it had happened; that he was familiar with his brother's car; and that it weighed Three Thousand Two Hundred (3,200) pounds.

For the defendant, the operator of the bus, Manley Davis, testified that the deceased, Ernest E. Phillips, had been riding the bus on this run for some time prior to the night of the accident; that he was familiar with the route and the stops; that the point where the bus stopped that night to pick up Mrs. Carnes was a usual stop; and that Phillips had been on the bus before when it stopped there. He testified that Mrs. Carnes was standing "just off the black top over on the dirt"; that when he stopped the bus the right hand wheels were as far over on the black top shoulder as possible; and that had he gone any farther over the bus would have struck her. He opened the door, causing a light in the door to be turned on, and she got aboard and was proceeding to her seat when the collision occurred. His testimony as to seeing the Phillips car coming up very rapidly from behind, and as to his having blinked the clearance lights on and off, and as to his having released the brakes when he saw that a collision was inevitable, has already been referred to. So, too, has been his testimony as to the violence of the impact, and as to the Southbound truck that was approaching. Asked why he did not pull the bus completely off the pavement, he said that not only was the lady standing "just off the black top," but also, apart from that fact, the place was rough and not a good place to pull off on with a bus load of passengers.

State Highway Patrolman Jack Moon, for the defendants, testified, in substance, as follows:

On the night of the accident, he was in his car in the Town of Heath Springs, about eleven (11) miles South of the place of the accident, when a car came through, headed

North. As soon as Moon could start his engine, he started in pursuit. Just South of Pleasant Hill (which is 2 miles North of Heath Springs) he saw the tail lights of a car, and thinking it was the car that he was pursuing, he slowed down in order to "check" its speed, and discovered that it was traveling at a normal rate of speed. Going through Pleasant Hill, he overtook this car and found that it was not the one that he had started out after, so he then accelerated to a high speed, about Eighty-five (85) miles per hour, and resumed the pursuit. When he came upon the scene of the wreck, Patrolman Grady Jones was already there, and Moon proceeded to direct traffic. On direct examination this witness stated that the car that was in the wreck was the one that he had started out to catch, and this he repeated under cross-examination, though at one point he could not be positive that the Phillips car was grey, or whether it was a sedan or a coupe.

Mrs. Mamie C. Carnes, another witness for the defendants, who, as before mentioned, was standing in the door of her house when the accident happened, testified that she saw her daughter-in-law, Mrs. Madelyn Carnes, cross the road and stand, as she always did, on the dirt shoulder, waiting for the bus; that she saw the bus pull over as far as possible without striking her; that "if he (the bus driver) had pulled over any further he would have run over her because she couldn't have gotten out of the way"; that just after Mrs. Madelyn Carnes had gotten aboard, and before she had had time to get to her seat, the collision took place; that the lights were burning on the inside of the bus; that witness did not see the Phillips car until it hit the bus with a terrific crash, "just like it dropped down out of mid-air"; and from the force of the crash she estimated its speed at about Seventy (70) miles an hour.

William Sullivan, a passenger, testified that the bus pulled over as far to the right on the paved shoulder as was possible without endangering the waiting passenger; and that beyond the paved shoulder the dirt portion of the road was rough.

He did not see the Phillips car until the collision had occurred.

Curtis Langley, another passenger, testified that when the bus was pulling over he felt the wheels go off the pavement and "hit the dirt", and that it stopped within about a foot and a half of the passenger. This witness, also, did not see the Phillips car until after the collision.

C. M. Davis, the owner of the bus, was not present when the accident occurred. He testified that between Six Hundred ($600.00) and Seven Hundred ($700.00) Dollars had been expended toward the repair of the bus, which was still incomplete.

From the foregoing summary of the evidence, it will be noted that there was none in support of plaintiff's charge that defendants were negligent in not having the bus equipped with proper lights and other safety devices, and that the plaintiff relied, for proof of violation of the statute, solely upon the testimony of Patrolman Jones to the effect that on the dirt shoulder there was, at the point of the accident, a "little wide place" where there was "room enough to get the bus off the highway". The testimony of the bus driver, as well as that of Mrs. Mamie Carnes and the four passengers who testified, was to the effect that it would have been impracticable to pull the bus off the pavement, not only because the prospective passenger was standing just off the paved shoulder, but also because the dirt shoulder was too rough for safety. In view of the fact that under the statute, Code 1952, § 46-481, the test of the requirement that a vehicle be brought to a stop off the paved or main travelled part of a highway is practicability, not possibility, it may be doubted that the testimony of Patrolman Jones, who did not witness the accident, was sufficient to take the case to the jury. But the respondent does not so urge under Section 7 of Rule 4 of this Court, and in our opinion the determination of that issue is not necessary.

It is undisputed that the right wheels of the bus were as far over on the paved shoulder as possible, leaving a clearance of Eighteen (18) feet of pavement to its left; that Phillips was familiar with the schedule of the bus and with its stopping places, including the one where the accident took place; that on the rear of the bus were two red reflectors and at least five lights, all burning; and that these lights were visible to an automobilist approaching from the rear, for a distance of seven-tenths (7/10) of a mile. There is no evidence that plaintiff's intestate could not have seen the rear end of the bus in ample time to avoid running into it had he been driving at a reasonable speed. Appellant's counsel earnestly argue that he may have been blinded by the lights of the South-bound tractor-trailer, or that his view of the rear of the bus may have been obscured by a car or cars ahead of him. There is no evidence that he was so blinded, or that his vision was so obscured; had there been, it would have emphasized the necessity for reducing his speed. Proof that his speed was excessive does not depend alone upon the testimony of Patrolman Moon, who was pursuing him, nor upon that of the eye-witnesses who testified to the violence of the collision; the complete demolition of the car, as shown by the photographs in evidence, is conclusive on that score. It is not necessary that the defendants be absolved from the charge of negligence in order that the plaintiff be barred of recovery, for the plea of contributory negligence presupposes actionable negligence on the part of the defendants. *Mishoe v. Atlantic Coast Line R. Co.,* 186 S. C. 402, 197 S. E. 97. Assuming that the operator of the bus was negligent in stopping where he did, however briefly, we agree with the trial court that consideration of all of the evidence in the light most favorable to the plaintiff's case can lead to no reasonable conclusion other than that plaintiff's intestate was negligent in failing to keep a proper lookout and in driving his car at a speed excessive in the circumstances, and that such negligence was a concurring and proximate cause of the collision.

Affirmed.

STUKES, TAYLOR *and* OXNER, JJ., and BRUCE LITTLE-JOHN, Acting Associate Justice, concur.